**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KENNETH KIRKLAND,

　　Plaintiff - Counterclaim-
　　Defendant - Appellee -
　　Cross-Appellant,

v.

ST. VRAIN VALLEY SCHOOL
DISTRICT NO. RE-1J, a Colorado
Public School District,

　　Defendant - Counter-
　　Claimant - Cross-
　　Appellee,

　　and

RICK SAMSON, TAMMY
PILKINGTON, SANDI SEARLES,
KATHY HALL, MIKE
RADEMACHER, LARRY SILVER,
BRENDA EVERETT, RANDY ZILA,

　　Defendants - Counter-Claimants
　　- Appellants - Cross-Appellees.

Nos. 05-1020, 05-1040

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 03-MK-1145 (MJW))**

_____

Patrick B. Mooney (Erica L. White, with him on the briefs), Semple, Miller,
Mooney & Farrington, P.C., Denver, Colorado, for Defendants -
Counter-Claimants - Appellants - Cross-Appellees.

Roger T. Castle, Roger T. Castle, P.C., Denver, Colorado, for Plaintiff - Counterclaim-Defendant - Appellee - Cross-Appellant.

Before **O'BRIEN**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

**EBEL**, Circuit Judge.

These interlocutory cross-appeals stem from a financial crisis occurring in the St. Vrain Valley School District No. RE-1J ("the District") in 2002. Due to several accounting errors made by personnel in the District's finance department, the District had unknowingly been operating for several years with a sizable and increasing deficit. When the District discovered this growing deficit, in the fall of 2002, it did not have enough money to meet its next payroll and could only continue operating after receiving substantial assistance from the State of Colorado.

Plaintiff-Appellant Kenneth Kirkland was the assistant superintendent of auxiliary services overseeing the District's finance department during this time period. In this litigation, he asserts that, in the wake of the District's discovering this deficit, the District, as well as its superintendent and individual School Board members (the "individual Defendants"), deprived Kirkland of property and liberty interests without due process when the District refused to abide by a resignation agreement Kirkland made with the District's superintendent, deciding instead to

2

suspend Kirkland without pay and eventually to terminate him.

In appeal No. 05-1020, the individual Defendants appeal the district court's decision denying them qualified immunity from Kirkland's claims. Because Kirkland failed to allege any constitutional violation, we conclude the individual Defendants are entitled to qualified immunity. We, therefore, REVERSE the district court's decision denying these Defendants immunity.

In appeal No. 05-1040, Kirkland appeals a discovery ruling. We decline to address the merits of this appeal, however, because we lack jurisdiction to do so. We, therefore, DISMISS the cross-appeal.

## I.    BACKGROUND

In 1999, the District hired Kirkland to be the assistant superintendent in charge of the District's auxiliary services. In that position, Kirkland supervised ten District departments, including the financial services department. Kirkland was employed pursuant to a series of one-year contracts, the last of which ran from July 1, 2002, through June 30, 2003.

In November 2002, Kirkland informed Superintendent Randy Zila that one of Kirkland's employees in the finance department had made several accounting errors that had resulted in an unexpected and dramatic shortfall in the District's budget. Due to these accounting errors, the District had been operating under the mistaken belief that it had a slight budget surplus; in fact, the District had between a $9 and $13 million deficit, and would not be able to meet its next

3

payroll. The District could only continue operating if it received "substantial loans from the State of Colorado and [implemented] significant spending cuts."

After this budget shortfall came to light, Superintendent Randy Zila and Assistant Superintendent Tom Garcia met with Kirkland, on November 13, 2002, and informed Kirkland that the School Board ("the Board") had lost confidence in his ability to provide the Board with accurate budget information. They requested that Kirkland resign. By the end of this meeting, Kirkland had agreed to resign in return for the District's continuing to pay him his salary and benefits through the remainder of his one-year employment contract. Garcia "accepted" Kirkland's handwritten resignation.[1] Several days later, however, at the November 16 school board meeting, the Board rejected Kirkland's resignation and the resignation agreement. The Board instead placed Kirkland on unpaid administrative leave.

Thereafter, in November 2002, Board member Rick Samson publicly commented that Kirkland had lied to the Board and had falsified documents. A local newspaper published those remarks.

In April 2003, Kirkland and the District reached a termination agreement. That written agreement, dated April 15, 2003, provided that Kirkland would "not request a hearing by the Board of Education regarding the termination," and in

---

[1]Kirkland's handwritten resignation stated "[e]ffective today, I hereby resign my position as Assistant Superintendent." Underneath, in another's handwriting (apparently Garcia's), is written "Accepted." Underneath that is the notation "Pay through the contract June 30, 03 Insurance through July 31, 03," followed by Garcia's signature and the date.

return, the Board would terminate Kirkland's employment without public comment. The Board did so on April 23, 2003.

Kirkland filed suit against the District, seven individual Board members, and the District's superintendent.[2] In that action, Kirkland asserted claims under 42 U.S.C. § 1983[3] alleging that 1) the District and the individual Defendants deprived him of property without due process by a) failing to abide by the November resignation agreement, b) suspending him without pay, and c) terminating him; and 2) the District and the individual Defendants deprived Kirkland of a liberty interest in his future employability without due process, based upon Board member Samson's public comments accusing Kirkland of dishonesty.[4] The individual Defendants moved for summary judgment, asserting

---

[2]Although he did not specifically state so in his complaint, we assume that Kirkland is suing the individual Defendants in their individual, rather than their official, capacities. See Moore v. City of Wynnewood, 57 F.3d 924, 929 n.4 (10th Cir. 1995) (noting qualified immunity is only available in suits against public officials in their individual, rather than their official, capacity); see also Beedle v. Wilson, 422 F.3d 1059, 1069 (10th Cir. 2005).

[3]Section 1983 provides, in pertinent part, that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[4]Kirkland also alleged that the District breached its employment contract
(continued...)

5

they were entitled to qualified immunity. The district court, however, denied these individual Defendants immunity.

## II.    APPEAL NO. 05-1020

In case No. 05-1020, the individual Defendants appeal the district court's decision denying them qualified immunity. Because a government official's qualified immunity provides, not simply a defense to liability, but a right not to stand trial in the first place, a district court's decision denying a government official qualified immunity, to the extent it turns on an issue of law, is an immediately appealable final collateral order. See Mitchell v. Forsyth, 472 U.S. 511, 524-27, 530 (1985). Thus, this court "ha[s] jurisdiction to review purely legal questions that arise from the denial of qualified immunity." Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005). In doing so, we "review de novo a district court's denial of a summary judgment motion raising qualified immunity questions." Id. In conducting this review, this court considers the evidence in the light most favorable to the non-moving party who, in this case, is Kirkland. See Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 841 (10th Cir. 2005).

---

[4](...continued)
with Kirkland by suspending him without pay, and breached the November resignation agreement by failing to abide by that agreement. The District, in turn, asserted two counterclaims alleging Kirkland had breached his employment and termination agreements with the District. The district court, however, declined to exercise supplemental jurisdiction over these four state-law claims, see 28 U.S.C. § 1367(c), and instead dismissed them without prejudice.

Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity decisions differently from other summary judgment decisions. After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, and the plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. If a favorable view of the facts alleged show[s] the violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct. When the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.

Smith v. Cochran, 339 F.3d 1205, 1211 (10th Cir. 2003) (citations, quotations omitted).[5]

Although at times it may be tempting for a court to address the second issue first, the Supreme Court directs that a court consider these questions in order. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official]'s conduct violated a constitutional right? This must be the initial inquiry. In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our

---

[5]If "the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Cochran, 339 F.3d at 1211 (quotation, alteration omitted). While this final element of the summary judgment analysis "must be conducted by the district court" when it rules on a summary judgment motion, this part of the analysis is not relevant to the court of appeals when, as here, we are reviewing an interlocutory appeal of the district court's decision denying qualified immunity. Id. at 1211 n.3.

insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the [government official]'s conduct was unlawful in the circumstances of the case.

Id. (citation omitted).

In this case, all of Kirkland's § 1983 claims allege that the Defendants, in some way or another, deprived him of procedural due process.

The Fourteenth Amendment protects citizens from the deprivation of life, liberty, or property, without due process of law. Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision. To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?

Brown v. N.M. State Pers. Office, 399 F.3d 1248, 1254 (10th Cir. 2005) (citations, quotations, alteration omitted).

Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event. . . . [I]t is fundamental that except in emergency situations . . . due process requires that when a State seeks to terminate a protected interest, it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective.

Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570 n.7 (1972) (citations, quotations, alterations omitted). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Id. at 570 n.8 (quotation omitted).

8

**A.** **Whether the individual Defendants are entitled to qualified immunity on Kirkland's claim that Defendants deprived him of a property interest without due process when the District failed to abide by the November resignation agreement.**

On November 13, 2002, Superintendent Randy Zila and Assistant Superintendent Tom Garcia met with Kirkland, informed him that the Board had lost confidence in Kirkland's ability to provide the Board with accurate budget information, and requested Kirkland's resignation. Kirkland agreed to resign in exchange for the District's continuing to pay him his salary and benefits through the duration of his one-year employment contract, which ended June 30, 2003. The Board, however, rejected Kirkland's resignation and the resignation agreement. Kirkland alleges that by rejecting this resignation agreement, the individual Defendants deprived him of a property interest in that agreement without due process. We conclude that Kirkland did not have a protected property interest in the resignation agreement.

"Property interests are not created by the Constitution, but rather by independent sources such as state law." Brown, 399 F.3d at 1254 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985)); see also Roth, 408 U.S. at 577. "Thus, constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials." Hulen v. Yates, 322 F.3d 1229, 1240 (10th Cir. 2003) (per curiam) (citing, e.g., Roth and Loudermill).

9

Kirkland asserts he had a property interest in the resignation agreement because it was an enforceable contract under Colorado law. But pursuant to District policy, the Board first had to approve any expenditure over $50,000. And paying Kirkland the remainder of his salary and benefits through June 30, 2003, would have required such an expenditure. Therefore, the resignation agreement did not bind the District unless and until the Board approved it. And the Board never approved it. Because the resignation agreement thus never became an enforceable contract, Kirkland never gained a property interest in that agreement such that it would be subject to due process protections.

Kirkland protests that, when he met with Superintendent Zila and Assistant Superintendent Garcia, Kirkland believed these two administrators had the authority to enter into a resignation agreement with Kirkland that would be enforceable against the District. But that argument is unavailing.

Under Colorado law, a government entity's power to enter into contractual obligations is circumscribed by statute and ordinances. See Colo. Springs Fire Fighters Ass'n v. City of Colo. Springs, 784 P.2d 766, 773-74 (Colo. 1989); see also Shaw v. Sargent Sch. Dist. No. RE-33-J ex rel. Bd. of Educ., 21 P.3d 446, 449-50 (Colo. Ct. App. 2001) (applying this principle to a public school district). These restrictions are incorporated into any contract the government entity makes. See Keeling v. City of Grand Junction, 689 P.2d 679, 680 (Colo. Ct. App. 1984); see also Colo. Inv. Servs., Inc. v. City of Westminster, 636 P.2d 1316, 1318

10

(Colo. Ct. App. 1981). Anyone that contracts with a government entity is charged with constructively knowing those restrictions and, therefore, cannot claim any justifiable reliance on representations made beyond the municipality's contractual authority. Colo. Springs Fire Fighters Ass'n, 784 P.2d at 774 (holding that "[p]ersons dealing with the City are on constructive notice of the scope of authority possessed by the municipal officials with whom they are dealing"; further holding that "[t]his constructive notice includes the knowledge that the city council acted pursuant to the authority granted by the city charter and subject to the limitations provided therein"); Keeling, 689 P.2d at 680 (holding that "[o]ne who contracts with a municipality is charged with knowledge of its limitations and restrictions in making contracts"); Colo. Inv. Servs., Inc., 636 P.2d at 1318 (same).

Superintendent Zila and Assistant Superintendent Garcia could not, as a matter of law, bind the Board to the resignation agreement because the resignation agreement required the District to expend more than $50,000 and the Board's written policies expressly required the Board to approve any such expenditure.[6] See Seeley v. Bd. of County Comm'rs, 791 P.2d 696, 700 (Colo.

[6]Kirkland briefly argues that, because the Board had already approved the expenditure of funds for his salary and benefits when the Board earlier approved his one-year employment contract in June 2002, the Board was not required again to approve the expenditure of these same funds through the later resignation agreement. However, the resignation agreement was a very different agreement than the earlier employment agreement.

(continued...)

11

1990) (holding government employee cannot enforce terms of contract that his government supervisor was not authorized to create); <u>Cherry Creek Aviation, Inc. v. City of Steamboat Springs</u>, 958 P.2d 515, 519 (Colo. Ct. App. 1998) ("Contracts executed by municipal corporations are void when there is a failure to comply with the mandatory provisions of the applicable statutes or charters."). And, regardless of Kirkland's subjective belief that Zila and Garcia had authority to bind the Board to the resignation agreement, Colorado law deems Kirkland to know the limitations on the District's authority to contract. <u>See</u> <u>Colo. Springs Fire Fighters Ass'n</u>, 784 P.2d at 774; <u>Keeling</u>, 689 P.2d at 680.

For these reasons, Kirkland did not have a property interest in the November 13 resignation agreement. Therefore, he cannot allege a constitutional deprivation of property without due process. The individual Defendants are entitled to qualified immunity on this claim.

**B.     Whether the individual Defendants are entitled to qualified**

---

[6](...continued)
The evidence supports the District's assertion that District policy required the Board to approve the resignation agreement by the very fact that Zila presented the agreement to the Board seeking its approval. Further, there is no suggestion that the District did not require Board approval in other, similar cases. Kirkland himself testified in his deposition that "[e]very time there was a resignation, the board reported on it and acted on it," but that "in all the time that I worked at St. Vrain Valley School District, I never once saw any time when the board did not support the terms of the resignation that Tom Garcia negotiated. It never occurred to me that wouldn't be the case with mine." This testimony, then, further confirms the District's assertion that its policy did require the Board to approve the resignation agreement with Kirkland. <u>See</u> <u>Widder v. Durango Sch. Dist. No. 9-R</u>, 85 P.3d 518, 528 n.13 (Colo. 2004).

12

**immunity on Kirkland's claim that the Defendants deprived him of a property interest without due process when the Board suspended him without pay.**

Kirkland alleges that the individual Defendants deprived him of procedural due process when, on November 16, 2002, they suspended him without pay. Defendants concede that Kirkland possessed a property interest in his one-year employment contract, running from July 1, 2002 through June 30, 2003. For purposes of this appeal, we assume, without deciding, that a government employee's suspension without pay amounts to a deprivation triggering some degree of due process protections. Similarly, in Gilbert v. Homar, the Supreme Court assumed, without deciding, that a government entity's suspension, without pay, of a public employee, who has a protected property interest in his continued employment, amounts to a property deprivation sufficient to implicate due process protections. See 520 U.S. 924, 929 (1997) (noting "we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination").

The question presented, then, is what process Kirkland was due. See Brown, 399 F.3d at 1255. While "state law determines whether a person has a property right," "it is purely a matter of federal constitutional law whether the procedure afforded was adequate." Hulen, 322 F.3d at 1247. Kirkland asserts that the District should have afforded him both pre- and post-suspension due process.

13

**1.** **Whether Kirkland was entitled to procedural due process before the District suspended him without pay.**

"[T]he root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing <u>before</u> he is deprived of any significant property interest." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (quotation omitted). Nonetheless, "[t]here are . . . some situations in which a postdeprivation hearing will satisfy due process requirements." <u>Id.</u> at 542 n.7. "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." <u>Gilbert</u>, 520 U.S. at 930 (quotation omitted). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." <u>Id.</u> (quotation omitted).

In addressing what process is due, the Court in <u>Gilbert</u> applied a three-part balancing test:

> To determine what process is constitutionally due, we have generally balanced three distinct factors:
>
> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest."

<u>Gilbert</u>, 520 U.S. at 931-32 (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

    **a.** **Kirkland's private interest**

14

In Gilbert, the Court considered a state university's decision to suspend one of its police officers without pay, following the officer's arrest on felony drug charges. See id. at 926-27. In considering the employee's interest in that case, the Court recognized an employee's interest in continuing to be paid. See id. at 932 (recognizing "the severity of depriving someone of the means of his livelihood"). Nevertheless, the Court further indicated that

> in determining what process is due, account must be taken of the length and finality of the deprivation. [Distinguishing] the employee in Loudermill, who faced termination, [from the employee in Gilbert, who] faced only a temporary suspension without pay[, the Court noted that] [s]o long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all.

Id.

In this case, Kirkland had the right to pursue a post-suspension grievance immediately following his suspension. And this grievance procedure provided for expedited review.[7] So, although Kirkland has a private interest that will be

_____

[7]District policy specifically provided that an "administrative employee" such as Kirkland could file a grievance, defined as "a complaint based upon a wrong believed by an administrative employee to have been suffered by him through an act or condition which is contrary to established Board policy or Board and/or administrative practice governing or affecting employees," unless the challenged action falls within one of four listed exceptions. Kirkland does not assert that the Board's suspending him without pay falls into any of those four exceptions.

Pursuant to this policy, the "grievant or his representative" must present the grievance in writing to his immediate superior, with copies to the superintendent

(continued...)

15

affected by a suspension, that effect is attenuated by the relatively prompt

post-suspension hearing that is provided.

### b. Risk of erroneous deprivation of property interest

Next, Gilbert directs that we consider the risk of an erroneous deprivation

when the District suspended Kirkland without prior notice and an opportunity to

respond, as well as the likely value of any additional post-suspension procedures

available to him. See Gilbert, 520 U.S. at 933; see also Mustafa v. Clark County

Sch. Dist., 157 F.3d 1169, 1177 (9th Cir. 1998) (noting that, what the Supreme

Court in Gilbert emphasized as "important is that the employer's decision to

suspend the employee not be 'baseless or unwarranted'") (quoting Gilbert, 520

U.S. at 934). In Gilbert, because the university police officer had been suspended

_____

[7](...continued)
and the president of the St. Vrain Valley Association of School Administrators
("SVVASA"), "not later than 15 calendar days following its occurrence or the
time when [the grievant] should have known about it." "The number of days
allotted at each step of the grievance procedure is to be considered as a maximum
time limit. Every attempt should be made to resolve grievances as quickly as
possible." Where, as here, the "grievance result[s] from action taken by the
superintendent or the Board," the grievant "may request a hearing of his
grievance by the superintendent." "The grievant and the superintendent will meet
in an attempt to resolve the grievance not later than five contract days following
the date on which the hearing was requested," and "[t]he superintendent will
communicate his decision in writing to the grievant," as well as the SVVASA
President, "not later than 10 contract days following the hearing." Finally, within
"five contract days" after the superintendent's decision, the grievant can request a
hearing before the Board. The Board will meet with the grievant, "not later than
10 contract days following the date on which the hearing was requested," in an
attempt to resolve the grievance. And "[t]he Board will communicate its decision
in writing to the grievant," with a copy to the SVVASA president, "not later than
15 contract days following the hearing."

16

without pay only after being charged with a criminal felony offense, there had been an independent criminal investigation resulting in a determination that charges were warranted. See 520 U.S. at 926-28, 933-34. There was no such independent prosecutorial determination in this case. Nevertheless, before suspending Kirkland, the District did have two employees who worked for a nearby school district, Sandi Rotella[8] and Donald Smith, review the District's budget problems. Rotella and Smith reported to the School Board that Kirkland's finance department had made significant and easily discoverable accounting errors that resulted in the unforeseen budget shortfall. Rotella and Smith gave this report to the Board prior to the Board's decision to place Kirkland on unpaid administrative leave. Rotella's and Smith's investigation reduced the likelihood that the District was erroneously suspending Kirkland without pay; that is, it reduced the likelihood that the District's decision to suspend Kirkland without pay was "baseless and unwarranted," Mustafa, 157 F.3d at 1177. Furthermore, as previously mentioned, Kirkland had available to him a post-suspension grievance procedure through which he could fairly promptly challenge the suspension if it was predicated on factual inaccuracies.

c. **District's interest**

---

[8]Kirkland challenges the District's characterization of Rotella as an independent party because she had previously worked with Zila and analyzed the District's budget situation at Zila's request. There is nothing in the record, however, to suggest that her review was anything other than independent.

17

Finally, we consider the District's interest. See Gilbert, 520 U.S. at 931-32. There are times where a government entity "must act quickly, or where it would be impractical to provide predeprivation process." Id. at 930. For example, a government employer "has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility." Id. at 932. Kirkland occupies such a position. Cf. Mustafa, 157 F.3d at 1177 (recognizing that "a public school teacher . . . occupies a position of great public trust and high public visibility") (quotation omitted). Kirkland was the administrator in charge of the District's finance department. Errors made in that department had resulted in an unexpected multi-million dollar deficit that was, among other things, going to prevent the District from meeting its next payroll. The District, then, certainly had a significant interest and an immediate need in having someone besides Kirkland analyze the situation and provide the Board with accurate information on the financial condition of the District. The District's interest weighs heavily in favor of its immediately suspending Kirkland without pay.[9]

_____

[9]Kirkland nevertheless asserts that the District could have easily paid him during the suspension. But the Supreme Court, in Gilbert, rejected a similar argument:

> Respondent contends that [the Government employer's] interest in maintaining public confidence could have been accommodated by suspending him with pay until he had a hearing. We think, however, that the government does not have to give an employee charged with a

(continued...)

18

### d. Conclusion

After weighing these factors, we conclude Kirkland was not constitutionally entitled to notice and an opportunity to respond <u>before</u> the District suspended him without pay. In particular, the District's strong interest in suspending Kirkland, under circumstances requiring quick action to address the budget shortfall, outweigh Kirkland's temporary loss of pay. This is particularly true in light of the post-suspension grievance procedure that Kirkland could have promptly invoked upon his suspension without pay. In light of our conclusion that Kirkland was not entitled to pre-suspension due process, he has failed to allege a constitutional violation resulting from the District suspending him without pay before providing notice and an opportunity for Kirkland to respond. Therefore, the individual Defendants are entitled to qualified immunity on this claim as well.[10]

---

[9](...continued)
felony a paid leave at taxpayer expense. If his services to the government are no longer useful once the felony charge has been filed, the Constitution does not require the government to bear the added expense of hiring a replacement while still paying him.

520 U.S. at 932. The same reasoning applies in this case.

[10]Even if Kirkland were entitled to a pre-suspension hearing, we would nevertheless then have to conclude that such a right was not clearly established at the time the District suspended Kirkland with pay. The Supreme Court, in <u>Gilbert</u>, only assumed, but did not decide, that suspending a tenured public employee without pay was a sufficient deprivation to implicate due process protections. <u>See</u> 520 U.S. at 929. So that proposition was not clearly established

(continued...)

### 2. Whether Kirkland was entitled to procedural due process after the District suspended him without pay.

Kirkland next alleges that Defendants failed to provide him with adequate post-suspension due process. See generally Gilbert, 520 U.S. at 935 (noting that whether the government employee "was provided an adequately prompt post-suspension hearing" is a separate question from whether he was entitled to pre-suspension due process); O'Connor v. Pierson, 426 F.3d 187, 197 (2d Cir. 2005) (noting that, "[w]hile the ultimate conclusion about procedural adequacy . . . turns on the full set of pre- and post-deprivation procedures available, courts often analyze pre- and post-deprivation procedures separately"). Although Kirkland could have immediately filed a grievance challenging his suspension, he chose not to do so. In light of that, he cannot now allege that the individual Defendants deprived him of post-suspension due process.[11] See

_____

[10](...continued)
by Gilbert. Cf. Strouss v. Mich. Dep't of Corrs., 250 F.3d 336, 345 (6th Cir. 2001) (relying on Court's assertion in Gilbert that it was not deciding whether suspension without pay implicated property interest protected by due process to conclude that such a right was not clearly established prior to Gilbert). And Kirkland fails to assert any Tenth Circuit case law that clearly established that a suspension without pay is a sufficient deprivation of a property interest in tenured employment to trigger due process protections.

[11]Kirkland argues that a letter he sent to Zila on November 20, 2002, was in effect a grievance. There is nothing in the record, however, to support Kirkland's characterization of that letter as a grievance. The Board decided to suspend Kirkland without pay on November 16, 2002. Assistant Superintendent Tom Garcia verbally notified Kirkland of the suspension on that day. Superintendent Zila then sent Kirkland a letter, dated November 18, 2002, in which Zila

(continued...)

Sandoval v. City of Boulder, 388 F.3d 1312, 1328-29 (10th Cir. 2004) (recognizing government employee can waive right to procedural due process); see also Luellen v. City of E. Chicago, 350 F.3d 604, 616 (7th Cir. 2003) (holding that "because [the employee's] deprivation was relatively small and the City's interest relatively strong, and because [the employee] was provided with the opportunity for additional procedures to vindicate his rights but did not avail himself of those opportunities, we believe that the requirements of due process were satisfied."); cf. Montgomery v. City of Ardmore, 365 F.3d 926, 938 (10th Cir. 2004) (concluding City provided adequate post-termination procedures through collective bargaining agreement's grievance procedures, but employee chose not to pursue those). See generally Boddie v. Connecticut, 401 U.S. 371, 378-79 (1971) (recognizing hearing required by due process is subject to waiver).

[11](...continued)
reiterated that the Board had suspended Kirkland without pay. Additionally, Zila informed Kirkland that Zila intended to recommend that the Board fire Kirkland. Zila further informed Kirkland that he could request "a more detailed statement of [Zila's] reasons for" recommending that the Board fire Kirkland. It was in response to this letter that Kirkland sent his own letter dated November 20, 2002, requesting the more detailed statement of reasons why Zila would seek Kirkland's termination. Kirkland did not specifically indicate that this letter was a grievance. Nor is there any indication in the record that Kirkland sent a copy of this letter to the president of the St. Vrain Valley Association of School Administrators, as the grievance policy required. Moreover, although the grievance procedure provided for expedited review, Kirkland never sought to assert those time constraints. For these reasons, we reject as a matter of law Kirkland's characterization of this letter as a grievance. Kirkland has not asserted any evidence that would create a genuinely disputed factual issue as to whether Kirkland's letter could be considered a grievance filed pursuant to the District's available grievance procedure.

**C.      Whether the individual Defendants are entitled to qualified immunity from Kirkland's claim alleging Defendants deprived him of procedural due process before terminating him.**

Kirkland alleges that Defendants deprived him of a property interest in his one-year term of employment by firing him, without first providing him with adequate notice and an opportunity to be heard.  Defendants concede that Kirkland has a property interest created by his one-year employment contract with the District.  Nevertheless, when Kirkland entered into the termination agreement with the District, in April 2003, he waived any right to a pre-termination hearing.  See Sandoval, 388 F.3d at 1328-29; see also Montgomery, 365 F.3d at 938.  That written agreement, dated April 15, 2003, specifically provided that Kirkland would "not request a hearing by the Board of Education regarding the termination," and in return, the Board would terminate Kirkland's employment without public comment.  And Kirkland testified in his deposition accordingly: "Did you understand by signing this document, you would not have a hearing before the Board of Education? [Kirkland:] Yes, I did."  The termination agreement anticipated that Kirkland would initiate litigation against the District, and the District agreed that in that litigation, it would not assert as a defense that Kirkland had failed to exhaust his administrative remedies.  According to the terms of the termination agreement, the Board terminated Kirkland's employment, without any public comment, during a Board meeting on April 23, 2003.  Because Kirkland, by this agreement, waived any right to a pre-termination hearing, he has

22

failed to allege a claim for the deprivation of due process. The individual Defendants, therefore, were entitled to qualified immunity on this claim as well.

**D.** **Whether the individual Defendants are entitled to qualified immunity from Kirkland's claim that Defendants deprived him of a liberty interest in his reputation without due process.**

Kirkland alleges that Defendants deprived him of a liberty interest in his future employability when Board member Samson made public comments indicating that Kirkland had lied to the Board and falsified documents. In addition, Kirkland alleges that Defendants deprived him of this liberty interest without due process when he asked for, but never received, a "name-clearing" hearing. But, again, Kirkland waived his right to any hearing through his termination agreement with the District. Further, Kirkland acknowledges that he never requested a hearing to clear his name separate from his request for a pre-termination hearing. In light of that, Kirkland's decision to waive a hearing before the Board, in the April termination agreement, was sufficient to waive any right Kirkland might have had to a name-clearing hearing separate from a pre-termination hearing. Because Kirkland thus waived his right to due process, he has failed to allege a constitutional violation. The individual Defendants are entitled to qualified immunity on this claim.

**E.** **Conclusion**

Kirkland's claims alleging the Defendants deprived him of property and

23

liberty interests without due process fail to allege a constitutional violation. For that reason, the district court erred in denying the individual Defendants qualified immunity on these claims.

## III. APPEAL NO. 05-1040

In this cross-appeal, No. 05-1040, Kirkland challenges a discovery ruling. The magistrate judge limited each side to twenty-five interrogatories and requests for production of documents. The parties, however, disagreed on, among other things, how these twenty-five should be counted.[12] Kirkland, therefore, filed a motion to compel discovery, which the magistrate judge denied. Kirkland could have filed objections with the district court challenging the magistrate judge's ruling. See Fed. R. Civ. P. 72(a). Instead, Kirkland and four of the individual Defendants purportedly agreed to settle Kirkland's claims asserted against them.[13] In light of that settlement, Kirkland decided not to file any objections to the magistrate judge's discovery ruling. After the time for Kirkland to file any such objections had expired, however, the four Defendants backed out of the settlement

---

[12]Kirkland contended that he could propound twenty-five requests to each defendant; Defendants asserted, on the other hand, that Kirkland could propound only a sum total of twenty-five requests to all Defendants.

[13]According to Kirkland, he offered to dismiss without prejudice his claims against individual Defendants Pilkington, Rademacher, Silver and Everett, if these four Defendants agreed to testify on Kirkland's behalf at trial and make "a good faith effort to search for all documents requested in all of Plaintiff's Requests for Production of Documents and also serve and sign formal written responses to those requests."

24

agreement.[14] Kirkland then filed a motion to enforce the parties' settlement agreement. The magistrate judge recommended denying that motion, and the district court adopted that recommendation. Kirkland now challenges that decision in his interlocutory cross-appeal.

Because we have already concluded that all of the individual Defendants are entitled to qualified immunity on all of Kirkland's claims, and because this discovery dispute involves four of those individual Defendants, this appeal is moot. See Varrone v. Bilotti, 123 F.3d 75, 82 (2d Cir. 1997); Foster v. City of Lake Jackson, 28 F.3d 425, 428 n. 5 (5th Cir. 1994); see also McCardle v. Haddad, 131 F.3d 43, 47 (2d Cir. 1997) (recognizing that, if defendant was entitled to qualified immunity, that would moot plaintiff's contentions asserted on appeal). We, therefore, lack jurisdiction to consider it. See generally Arizonans for Official English v. Arizona, 520 U.S. 43, 67-74 (1997) (recognizing that if there is no longer a live case or controversy, appellate court lacks jurisdiction to

---

[14]Kirkland asserts that these Defendants informed him that they "could not in good faith respond to any of the discovery requests and that the Defendants had therefore decided to consider the settlement agreement cancelled." The individual Defendants, however, contend that Kirkland later included an additional term in the settlement agreement that provided that they would "waive all of their substantive objections and privilege assertions when they answered [Kirkland]'s discovery requests." These Defendants, however, were concerned that a number of Kirkland's discovery requests requested "information protected by the attorney-client privilege (a privilege which belongs to the school district, not the individual defendants) and many of [Kirkland]'s other requests are overly broad and fail to reasonably identify the information sought." It was at this point that they decided not to settle Kirkland's claims against them.

consider the appeal); see also 13A Charles Alan Wright et al., Federal Practice &

Procedure § 3533.10 (2d ed. 1984) (recognizing "that an appellate court should

not be required to resolve a moot dispute").

Even if there was no mootness problem, this court would still lack

jurisdiction to consider the merits of this interlocutory cross-appeal.

> Courts of appeals normally have jurisdiction only over final decisions
> of the district courts. 28 U.S.C. § 1291. There are exceptions to [this]
> final judgment rule. A judgment that is not the complete and final
> judgment in a case is immediately appealable if it falls in that small
> class which finally determine claims of right separable from, and
> collateral to, rights asserted in the action, too important to be denied
> review and too independent of the cause itself to require that appellate
> consideration be deferred until the whole case is adjudicated.

Timpanogos Tribe v. Conway, 286 F.3d 1195, 1199 (10th Cir. 2002) (citing

Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)) (quotation,

alteration omitted). This court, then, has "jurisdiction over an extremely narrow

class of claims raised interlocutorily. The collateral order doctrine sets a high bar

for any interlocutory appeal, allowing appeal from only those decisions that are

conclusive, resolve important questions separate from the merits, and are

effectively unreviewable on appeal from final judgment." Id. at 1200.

As previously explained, this court has jurisdiction to consider the

individual Defendants' interlocutory appeal from the denial of qualified

immunity. See Perez, 421 F.3d at 1131; see also Denver Justice and Peace

Comm., Inc. v. City of Golden, 405 F.3d 923, 927 (10th Cir. 2005), cert, denied,

26

126 S. Ct. 1164 (2006). In light of that, we also have "discretion to exercise pendent appellate jurisdiction over nonappealable issues . . . in the same case." Roska ex rel. Roska v. Sneddon, 437 F.3d 964, 970 (10th Cir. 2006).

> It is appropriate to exercise pendent appellate jurisdiction where the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one. A nonappealable decision is inextricably intertwined with an appealable one if resolution of the appealable decision necessarily resolves the nonappealable issue as well. The exercise of pendent jurisdiction, however, is generally disfavored.

Id. (citations, quotations omitted). Furthermore, "the Cohen [collateral order] doctrine applies to pendent claims as well. Pendent claims are thus appealable 'if, and only if, they too fall within Cohen's collateral-order exception to the final-judgment rule.'" Timpanogos Tribe, 286 F.3d at 1200 (quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 49 (1995)).

"This circuit has repeatedly held that discovery orders are not appealable under the Cohen doctrine." Boughton v. Cotter Corp., 10 F.3d 746, 749 (10th Cir. 1993) (citing cases). There is no reason to depart from that established rule in this case. See id. at 749-50 (recognizing there may be rare exceptions). The district court's decision denying Kirkland's motion to enforce the settlement agreement can be adequately reviewed on appeal from the final judgment entered in this case. See id.

Moreover, this cross-appeal does not raise any issue that is inextricably

27

intertwined with the qualified immunity question we addressed as part of the individual Defendants' appeal. Kirkland specifically asserts that the documents he sought to discover through the settlement agreement were relevant to the individual Defendants' appeal of the denial of qualified immunity because the discovered materials would establish "the individual Defendants' prior understanding and knowledge that Kirkland was entitled to the due process that they failed and refused to provide him." But, as analyzed above, our qualified immunity analysis did not turn on that issue. We do not believe, therefore, that the discovery ruling was inextricably intertwined with qualified immunity.

For all of these reasons, therefore, we DISMISS the cross-appeal.

## IV. CONCLUSION

In appeal No. 05-1020, we REVERSE the district court's decision denying the individual Defendants qualified immunity and REMAND for further proceedings consistent with this opinion. We DISMISS the cross-appeal, No. 05-1040, because we lack appellate jurisdiction to consider it.

28