FILED
United States Court of Appeals
Tenth Circuit

May 2, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

DANA L. PRICE-CORNELISON,

     Plaintiff - Appellee,

v.

STEVE BROOKS, individually,

     Defendant - Appellant.

No. 05-6140

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:04-CV-00241-W)**

---

David W. Lee (Ambre C. Gooch, with him on the briefs), of Comingdeer, Lee & Gooch, Oklahoma City, Oklahoma, for Defendant-Appellant Steve Brooks.

Valerie Williford, of Oklahoma City, Oklahoma, for Plaintiff-Appellee Dana L. Price-Cornelison.

---

Before **LUCERO, EBEL** and **O'BRIEN**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

     Defendant-Appellant Steve Brooks, the Undersheriff of Garvin County,

Oklahoma, appeals the district court's decision denying him qualified immunity

on Plaintiff-Appellee Dana L. Price-Cornelison's two constitutional claims that

Brooks failed to enforce Price-Cornelison's protective orders because she is a lesbian victim of domestic violence. Price-Cornelison specifically alleged that, in refusing to enforce her protective orders, Brooks 1) denied her equal protection of the law; and 2) helped a private citizen unlawfully seize Price-Cornelison's property, contrary to the Fourth Amendment. We conclude that Brooks is entitled to qualified immunity on the equal protection claim, to the extent that that claim is based upon Brooks' refusal to enforce Price-Cornelison's emergency protective order on October 16, 2003, and therefore we reverse the district court on that portion of Price-Cornelison's equal protection claim. But we agree with the district court that Brooks is not entitled to qualified immunity on the equal protection claim, to the extent that claim is based upon Brooks' refusal to enforce Price-Cornelison's permanent protective order, on November 3, 2003. Nor is Brooks entitled to qualified immunity on the Fourth Amendment claim. Consequently we affirm these portions of the district court's ruling.

## I. BACKGROUND

Viewing the evidence in the light most favorable to Price-Cornelison, see Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J, 464 F.3d 1182, 1188 (10th Cir. 2006), the record establishes the following: Price-Cornelison had been involved in a homosexual relationship with Vickie Rogers since 1996. In 2003, the couple was living together at Price-Cornelison's farm, Lost Spring Farm ("the farm"), located near Pauls Valley, Garvin County, Oklahoma. Price-Cornelison, who is

2

an anesthetist, worked an hour away, at a hospital in Muenster, Texas. She had an apartment in Muenster where she stayed overnight when she was on call at the hospital. Rogers stayed on the farm and took care of the couple's horses. Eventually Rogers grew tired of caring for the horses, so Price-Cornelison hired several farmhands to live on the farm to take care of the horses.

Price-Cornelison's and Roger's relationship deteriorated. On October 16, 2003, Price-Cornelison sought an emergency protective order from a Garvin County court, alleging that Rogers had threatened to shoot both Price-Cornelison and then herself and that Rogers had fired a gun over the telephone while making this threat. In her petition for the emergency protective order, Price-Cornelison asked the court to order Rogers to leave the residence "on or before" the following day, October 17, 2003. State Judge Tipton issued the emergency protective order that same day, October 16. That order directed Rogers "to immediately leave" her and Price-Cornelison's residence "or before 10-17-03."

After the state court issued the emergency protective order, Price-Cornelison went to work at the hospital in Muenster, Texas. A Garvin County sheriff's deputy served the emergency protective order on Rogers that same day, October 16. Rogers and some of her family and friends then began removing property from the farm. During this time, Price-Cornelison's farmhands called her in Texas to report that Rogers was taking "everything" from the farm. Price-Cornelison called the Garvin County sheriff's office and spoke to

3

Undersheriff Brooks, who indicated that he had been assigned to handle her situation. When Price-Cornelison asked Brooks to go out to the farm and stop Rogers from removing Price-Cornelison's property, Brooks informed Price-Cornelison that Oklahoma is "a community property state and that [Rogers] could take anything she want[ed]."[1] Price-Cornelison then asked Brooks to make a police report about the incident, but he refused, telling her that this was a civil matter. Price-Cornelison responded that she would have to leave work in Texas and drive back home to the farm to stop Rogers from taking Price-Cornelison's property. But Brooks informed Price-Cornelison that if she went to the farm, she would be arrested.

Price-Cornelison called the Garvin County sheriff's office several more times that day, to no avail. In addition, one of Price-Cornelison's friends, Mary Sanchez, called the sheriff's office and she, too, spoke to Brooks. Brooks told Sanchez the same thing he had told Price-Cornelison—Oklahoma was a community property state; pursuant to the terms of the emergency protective order, Rogers could remove whatever property she wanted up until the next day, October 17, 2003; and, according to Brooks, Price-Cornelison could not be present at her own home at this time. During this conversation, Brooks also explained to Sanchez that Price-Cornelison had been "in one of those lesbian

---

[1] Brooks testified at his deposition that he instead told Price-Cornelison that Rogers had claimed that the property that she was taking from the farm belonged to her and so Rogers could remove that property from the farm.

4

relationships. They have lived together for a long time, and they might as well have been like they were married."

Later that same day, Price-Cornelison called her attorney, whose office was in Oklahoma City. The attorney in turn called the Garvin County sheriff's office and also spoke to Brooks. According to Brooks, the attorney suggested Brooks get "off his doughnut-eating ass and do something." This suggestion was not well received; Brooks hung up on the attorney.

Brooks then went home, leaving instructions at the sheriff's office that if anyone called again about Price-Cornelison's emergency protective order, sheriff's personnel were to have the caller contact Brooks the next morning. According to Brooks, he left these instructions because he "did not want any of [the other deputies] to be negotiators as to who owned the property."

Heeding Brooks' warning, Price-Cornelison did not return home to the farm until she knew Rogers was no longer there. When Price-Cornelison did return home, late at night on October 16, she found that Rogers had taken many things belonging to Price-Cornelison, including appliances, furniture, electronics, pictures off the wall, tools, horse trailers and equipment, farm implements, and welding equipment, as well as all the horse and breeding records.

Two weeks later, on October 31, 2003, state Judge Blalock issued Price-Cornelison a permanent protective order against Rogers. That order required Rogers, among other things, "to remain away from" Price-Cornelison

and away from her residence. Despite this permanent protective order, on November 3, 2003, Rogers returned to Lost Spring Farm with her sister, gaining access to the farm by crawling under a fence. Although at the time Price-Cornelison was in town buying supplies, one of her farmhands was at the farm and tried unsuccessfully to stop Rogers from entering onto the property. Rogers got into a verbal and physical confrontation with this farmhand. The farmhand called Price-Cornelison to tell her Rogers was at the farm. Still in town, Price-Cornelison called the Garvin County sheriff's office twice to report that Rogers was violating the protective order by being present at Price-Cornelison's farm. The woman who answered the phone at the sheriff's office, apparently Deputy Cricket Warren, told Price-Cornelison that "they" were "busy" and were not going to send anyone out to her farm.

After calling the Sheriff's office, Price-Cornelison drove back to her farm. When Rogers saw Price-Cornelison's car approaching, she and her sister left the property. No one from the sheriff's office ever came out to the farm in response to Price-Cornelison's calls about Rogers violating the protective order.

The next day, Price-Cornelison asked a local prosecutor how she could get her protective order enforced. The prosecutor indicated that it should be enforced and suggested that Price-Cornelison talk to Brooks. She did, that same day. Brooks told Price-Cornelison that everyone in the courthouse was laughing at her and that she should fire her attorney and obtain local counsel to represent her.

6

Price-Cornelison commenced this action in federal court in March 2004, asserting federal civil rights claims under 42 U.S.C. § 1983 and tort claims under Oklahoma law against the Garvin County Board of County Commissioners (the "County") and Undersheriff Brooks.[2]  The only two claims at issue in this appeal are Price-Cornelison's claims that Brooks, in his individual capacity, 1) deprived Price-Cornelison of equal protection of the law when he refused to enforce her protective orders because she is a lesbian victim of domestic violence; and 2) violated Price-Cornelison's Fourth Amendment right to be free from unreasonable seizures of her property by threatening to arrest Price-Cornelison if she returned to her home on October 16 and thus dissuading Price-Cornelison from preventing Rogers from removing Price-Cornelison's property from the farm.  The district court denied Brooks qualified immunity on these two claims. He now appeals that decision.

## II.  APPELLATE JURISDICTION

Because qualified immunity provides, not simply a defense to liability, but a right not to stand trial in the first place, a district court's decision denying a government official qualified immunity is an immediately appealable final collateral order.  See Mitchell v. Forsyth, 472 U.S. 511, 524-27, 530 (1985).  This is true, however, only to the extent that the denial of immunity turns on an issue

---

[2]Price-Cornelison also named Sheriff Bill Roady as a defendant, but he no longer remains a party to this litigation.

7

of law.  See id. at 530; Fishbein ex rel. Fishbein v. City of Glenwood Springs,

469 F.3d 957, 960 (10th Cir. 2006).  "[T]his Court lacks jurisdiction over an

appeal from the denial of a defendant's summary judgment order based on

qualified immunity insofar as that order determines whether or not the pretrial

record sets forth a genuine issue of fact for trial."  Cortez v. McCauley, 478 F.3d

1108, 1120 n.16 (10th Cir. 2007) (en banc); see also Fishbein, 469 F.3d at 960.

## III.  STANDARD OF REVIEW

The district court denied Brooks qualified immunity at the summary

judgment stage of this litigation.

> Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions.  When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right.  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation.  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.

> We have held that, for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.  The Supreme Court has explained that officials can still be on notice that their conduct violates

8

established law even in novel factual circumstances.

Cortez, 478 F.3d at 1114-15 (citations, quotations, alterations omitted).

"Although at times it may be tempting for a court to address" the question of whether a constitutional right is clearly established before addressing whether the defendant violated such a constitutional right, "the Supreme Court directs that a court consider these questions in order." Kirkland, 464 F.3d at 1188 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)); see also Scott v. Harris, 127 S. Ct. 1769, 1774 n.4 (2007) (determining that it was unnecessary in that case to address the wisdom of Saucier's order of decision).

> The district court's denial of qualified immunity is a question of law which we review de novo. We review the evidence in the light most favorable to the nonmoving party. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) [subsequently amended].

Cortez, 478 F.3d at 1115 (citations, quotations, alterations omitted). At the summary judgment stage, Price-Cornelison must go beyond her pleadings and present some evidence in support of her claims. See Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1150-51 (10th Cir. 2006).

## IV.  ANALYSIS

### A.  Price's Equal Protection Claim.

**1.     Whether Price-Cornelison has asserted a constitutional violation.**

9

The threshold qualified immunity question presented is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Scott, 127 S. Ct. at 1774 (reviewing qualified immunity decision made at summary judgment stage of litigation). In this case, Price-Cornelison alleges Brooks deprived her of equal protection of the law.

"The equal protection clause provides that '[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 659 (10th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1). "Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'" Id. (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny. See Johnson v. California, 543 U.S. 499, 505 (2005) (addressing racial classification); Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir. 2002) (addressing classifications that "target a suspect class or involve a fundamental right"). In such a case, "the government has the burden of proving that [its] classifications are narrowly tailored measures that further compelling

10

governmental interests." Johnson, 543 U.S. at 505 (quotation omitted).

If, instead, the challenged government action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then this court will apply intermediate scrutiny. See Todd, 279 F.3d at 1210. In those cases, the test would be whether the government can demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives." Concrete Works of Colo., Inc. v. City and County of Denver, 321 F.3d 950, 959 (10th Cir. 2003).

Finally, where the challenged government action does not implicate either a fundamental right or a protected class, this court will apply a rational basis test.[3] See Todd, 279 F.3d at 1210. In those cases, this court inquires whether the government's classification bears "a rational relation to some legitimate end." Id. at 1213 (quotation omitted).

Price-Cornelison alleges that Brooks deprived her of equal protection of the law when he refused to enforce both her emergency and permanent protective

---

[3]If a government classification is neutral, that is, if it does not on it face implicate a protected class, heightened scrutiny might still apply if the application of that neutral policy has a disproportionate effect on a protected group. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); Washington v. Davis, 426 U.S. 229, 241-42 (1976). In order to be entitled to heightened scrutiny, however, the plaintiff challenging the facially neutral governmental action must also establish that the government was acting with a discriminatory intent. See Arlington Heights, 429 U.S. at 264-65; Washington, 426 U.S. at 239-42; see also Watson v. City of Kansas City, 857 F.2d 690, 694 (10th Cir. 1988).

orders to the same extent that he enforced protective orders obtained by heterosexual victims of domestic violence.[4]  And it is clear that, "[a]lthough there is no general constitutional right to police protection, the state may not discriminate in providing such protection."  Watson, 857 F.2d at 694.

Relying on Watson, Price-Cornelison alleged that the County has a policy of providing less protection to lesbian victims of domestic violence than to heterosexual domestic violence victims.  The district court held that Price-Cornelison had asserted sufficient evidence indicating that the County did have such a policy to go to trial on that issue.  Because we cannot review that determination in the context of this appeal, see Cortez, 478 F.3d at 1120 n.16, we assume here that the County has such a policy.

To support her claim against Brooks, in his individual capacity, Price-Cornelison relies on the County's policy, plus Brooks' treatment of Amanda Chandler, a heterosexual domestic violence victim who requested that Brooks enforce her protective order against her former husband.[5]  The evidence, viewed

_____

[4]Price-Cornelison specifically alleges discrimination against lesbian victims of domestic violence rather than discrimination against lesbians generally.  And this is in keeping with Price-Cornelison's evidence, indicating that Brooks' actions favored Rogers, who is herself a lesbian.

[5]During 2003, Brooks was only in charge of two cases involving domestic protective orders, Chandler's and Price-Cornelison's.  These cases, therefore, provide the most relevant comparison of Brooks' treatment of lesbian and heterosexual domestic violence victims.  While  Brooks also assisted other deputies in investigating the violation of protective orders on several occasions

(continued...)

12

in the light most favorable to Price-Cornelison, see Cortez, 478 F.3d at 1115, indicates the following: Amanda Chandler obtained a protective order requiring her former husband, Johnny Chandler, to stay away from her. On September 29, 2003, Amanda Chandler called the Garvin County Sheriff's office twice, reporting that her former husband was following her as she drove on the highway, and that he was trying to force her to pull over. Brooks advised Amanda Chandler to drive immediately to the Sheriff's office. Based upon Amanda Chandler's report, Brooks filed charges against Johnny Chandler for violating the protective order.

Price-Cornelison contrasts Brooks' enforcement of Amanda Chandler's protective order with his refusal to enforce both Price-Cornelison's emergency and permanent protective orders. But Brooks' refusal to enforce Price-Cornelison's emergency protective order, on October 16, 2003, by refusing to go to her farm and prevent Rogers from removing any property, is not sufficiently similar to Brooks' enforcing Amanda Chandler's protective order to provide support for Price-Cornelison's equal protection claim. Amanda Chandler's protective order was valid and enforceable on the day that she called seeking its enforcement. That was not the case with Price-Cornelison's emergency protective order. The express terms of the emergency protective order

---

[5](...continued)
during 2003, he was not the officer in charge of those other cases. These cases where Brooks was not in charge do not offer a sufficient comparison of how Brooks individually treated lesbian and heterosexual domestic violence victims for our purposes here.

13

provided that Rogers did not have to vacate Price-Cornelison's farm until October 17, which was the day after Price-Cornelison called soliciting Brooks' help. The record further indicates that Brooks, on October 16, did call the Garvin County court to verify the dates that appeared on the emergency protective order and was told that they were correct; the state judge had given Rogers a day to gather her possessions together before leaving. See generally Fishbein, 469 F.3d at 960 (relying on undisputed evidence in reviewing interlocutory appeal from denial of summary judgment based upon qualified immunity). Price-Cornelison has not asserted any evidence suggesting that, contrary to his treatment of Price-Cornelison, Brooks would have enforced a heterosexual domestic violence victim's protective order that was not yet effective under these same circumstances.

Price-Cornelison, however, did have an enforceable permanent protective order on November 3, 2003. We note here, at the outset of our discussion of Price-Cornelison's equal protection claim alleging that Brooks refused to enforce her permanent protective order, that the partial dissent takes issue with our reading of the facts relevant to these allegations. We readily acknowledge that there is evidence in the record that supports the dissent's version of the facts. Nevertheless, this case comes before us on an interlocutory appeal from the denial of qualified immunity at the summary judgment stage of litigation. In that context, we have to consider the evidence in the light most favorable to

14

Price-Cornelison, as the non-moving party, and we may not weigh or decide factual disputes.  See Cortez, 478 F.3d at 1115.  Nor may we consider, on interlocutory appeal, whether the evidence creates a genuine issue of fact sufficient to withstand summary judgment.  See id. at 1120 n.16.  If Price-Cornelison has alleged a constitutional violation, and for the reasons explained below we think she has, and if there is any evidence in the record to support the version of events averred by Price-Cornelison, we simply must affirm.  See Serna, 455 F.3d at 1150-51.  In our judgment, there is evidence in this record to support her allegations and, thus, to require us to affirm the district court's decision denying Brooks' qualified immunity at this stage of the proceedings.  In response to the concurrence/dissent's recitation of facts, we have included in footnotes 6, 7, and 8, infra, some of the specific evidence in the record that supports Price-Cornelison's version of the events.

Price-Cornelison's permanent protective order that was in effect on November 3, 2003, required Rogers, among other things, to remain away from Price-Cornelison's residence.  Both Price-Cornelison and her hired farmhand, Tesh Morgan, called the sheriff's office several times on that day, reporting that Rogers had come onto Price-Cornelison's property in violation of the permanent protective order.[6]  Brooks spoke with Morgan.  It appears that he may also have

_____

[6]In his affidavit, Brooks asserts this incident occurred on October 31, 2003. But in his deposition, Brooks instead indicates this incident may have occurred on

(continued...)

15

spoken to Price-Cornelison.[7]  Another deputy with whom Price-Cornelison spoke

---

[6](...continued)
November 3, 2003.

> Q.  Did you receive some further calls on November 3rd from someone at Ms. Cornelison's residence stating that Vickie Rogers had returned to the residence?
>
> A.  Was it November 3rd?  You know, possibly.  I don't recall the date on that.  Are you referring to the Teshla Morgan phone conversation?
>
> Q.  Yes.  Did you receive a call from Tesh Morgan around November 3rd?
>
> A.  Yes, I did.

And in his answers to interrogatories, Brooks indicates that Morgan called him about this incident "[a] couple of days after the protective order had been entered."  Because the permanent protective order had been entered on October 31, 2003, this lends further support to Brooks' deposition testimony that his conversation with Morgan occurred on November 3.

[7]Deputy Brooks testified during his deposition as follows:

> Q  Did you speak to Dana Price-Cornelison on November 3rd?
>
> A  I believe I did.
>
> Q  What did Ms. Price-Cornelison say to you that evening.
>
> A  I don't even really recall the conversation at this time.  Like I said, I believe I talked to her but I'm not positive I did or not.  I don't recall at this time.
>
>         . . . .
>
> Q  Okay.  I'm handing you Exhibit 6.  Is that a record of the call that took place on November 3rd?

(continued...)

16

informed Price-Cornelison that "they weren't sending" anybody to investigate because "they were busy."

The next day, Price-Cornelison and Morgan spoke to Brooks about getting Price-Cornelison's permanent protective order enforced. They explained that they were afraid of Rogers, in light of her previous use of firearms to accentuate her threats to Price-Cornelison and Rogers' later confrontation with Morgan, and they were particularly concerned because two of Price-Cornelison's other hired hands lived on the farm with their child. Brooks responded by advising Price-Cornelison that

> it was all over the courthouse in town about everything that happened between Vickie and [her] and that everybody was laughing, it was a big joke, and that everybody really thought that [her] attorney was not do[ing] a good job and that [the attorney] was—had really upset them at the sheriff's office, and they even said they were going to file a complaint against [the attorney], and [Brooks] told [Price-Cornelison that she] needed to get someone local to represent [her] if [she] w[as] going to have any chance with the—anything go on here in town at the courthouse.

(Id.) Despite these several reports that Rogers had violated the permanent

---

[7](...continued)
A  I'm assuming, yes.  11-3-2003 at 17:53.

Viewing the evidence in the light most favorable to Price-Cornelison, this court must assume, for purposes of this appeal, that Brooks spoke with her that night. See Kirkland, 464 F.3d at 1188. Further, Deputy Cricket Warren's notes of a call she received from Price-Cornelison's attorney later that evening indicate that Warren told the attorney that Price-Cornelison had called earlier that evening and spoken to a deputy. This lends further support to Brooks' deposition testimony that he did speak to Price-Cornelison that evening.

protective order, Brooks declined to send any deputies to investigate, and no charges were ever filed against Rogers, even though there was an eyewitness to the violation.[8]

Comparing Brooks' refusal to enforce Price-Cornelison's permanent protective order with the level of enforcement he provided to Amanda Chandler, and viewing this differing treatment in light of the County's policy of providing less police protection to lesbian victims of domestic violence than it provided to heterosexual domestic violence victims, Price-Cornelison has asserted sufficient evidence to show that Brooks himself treated Price-Cornelison less favorably than he treated other domestic violence victims.

Price-Cornelison next asserts that Brooks intentionally treated her differently because she is a lesbian and was a domestic violence victim. Because we must assume, for purposes of this appeal, that the County has a policy of

---

[8]The partial dissent points to Brooks' deposition testimony that he did not enforce the <u>emergency</u> protective order on October 16 because Price-Cornelison was in Texas and Rogers was in Oklahoma and with that space and distance between the two, Brooks was not worried about Price-Cornelison's safety. The dissent suggests that the same logic might apply on November 3. But the terms of the protective order in effect on November 3 were different from the terms of the earlier emergency protective order. The <u>emergency</u> protective order had directed Rogers not to "visit with, assault, molest or otherwise interfere <u>with the victim</u>," Price-Cornelison. (Emphasis added.) But the <u>permanent</u> protective order, in effect on November 3, directed Rogers, among other things, "to remain away from the victim(s) <u>and the residence</u> of the victim(s)." (Emphasis added.) There is evidence in the record, if believed, that establishes that Rogers clearly violated the permanent protective order on November 3 and that Brooks was made aware of that violation.

18

providing lesbian victims of domestic violence with less police protection than other domestic violence victims, it is reasonable to infer, for purposes of Brooks' motion for summary judgment, that, in refusing to enforce Price-Cornelison's permanent protective order, Brooks was acting pursuant to that policy. See Lauren L. McFarlane, Domestic Violence Victims v. Municipalities: Who Pays When the Police Will Not Respond?, 41 Case W. Res. L. Rev. 929, 948 (1991) (noting that, "once the existence of a municipal policy or custom has been shown, courts have assumed that the injurious actions of the individual police officers were taken pursuant to that policy, not merely on their own"). In addition, it is undisputed that at the time Brooks refused to enforce Price-Cornelison's permanent protective order, Brooks was aware that she is a lesbian; he had previously mentioned this fact to several people. Price-Cornelison has, therefore, presented sufficient evidence to show that Brooks refused to enforce her permanent protective order because she is a lesbian domestic violence victim.

Price-Cornelison has, therefore, adequately alleged Brooks deprived her of equal protection of the law when he refused to enforce her permanent protective order on November 3, 2003. Price-Cornelison's claim, however, does not implicate a fundamental right–"there is no general constitutional right to police protection." Watson, 857 F.2d at 694. Nor does it implicate a protected class,

19

which would warrant heightened scrutiny.[9]  A government official can, therefore,

distinguish between its citizens on the basis of sexual orientation, if that

classification bears "a rational relation to some legitimate end."  Todd, 279 F.3d

at 1213 (quotation omitted).  But Brooks has not asserted, and we cannot discern

on this record, a rational reason to provide less protection to lesbian victims of

domestic violence than to heterosexual domestic violence victims.

---

[9]In the district court, Price-Cornelison also alleged lesbians comprise a suspect class, warranting strict scrutiny.  Price-Cornelison does not reassert that claim now on appeal.  In any event, this court, like many others, has previously rejected the notion that homosexuality is a suspect classification.  See Walmer v. Dep't of Defense, 52 F.3d 851, 854 (10th Cir. 1995); see also Scarbrough v. Morgan County Bd. of Educ., 470 F.3d 250, 261 (6th Cir. 2006) (noting homosexuality is not suspect classification in the Sixth Circuit); Citizens for Equal Prot. v. Bruning, 455 F.3d 859, 866 (8th Cir. 2006) (noting Supreme Court has never held that sexual orientation is a suspect classification for equal protection purposes); Johnson v. Johnson, 385 F.3d 503, 532 (5th Cir. 2004) (noting neither Supreme Court nor Fifth Circuit has recognized sexual orientation as a suspect classification); Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 818 & n.16 (11th Cir. 2004) (en banc) (noting that all circuits that have addressed the issue have held that homosexuals are not a suspect class); Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126, 1132 (9th Cir. 1997) (noting homosexuals do not constitute a suspect class); Nabozny v. Podlesny, 92 F.3d 446, 458 (7th Cir. 1996) (declining to decide whether homosexuals are a suspect or quasi-suspect class, but noting that, in military context, Seventh Circuit has subjected discrimination on the basis of sexual orientation to rational basis test instead of applying strict scrutiny); Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir. 1996) (holding military personnel who engage in, or have a propensity to engage in, homosexual acts are not a suspect class); Woodward v. United States, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (holding homosexuality is neither a suspect nor a quasi-suspect class); Padula v. Webster, 822 F.2d 97, 101-04 (D.C. Cir. 1987) (same).  See generally Romer v. Evans, 517 U.S. 620, 631-33 (1996) (discussing amendment precluding enactment of laws prohibiting discrimination on basis of sexual orientation using rational basis test rather than applying strict scrutiny).

Price-Cornelison, therefore, has sufficiently established that Brooks violated her constitutional rights.

> ### 2. Whether this constitutional right was clearly established at the time Brooks refused to enforce Price-Cornelison's permanent protective order.

The next qualified immunity question presented is whether the equal protection right implicated here was clearly established at the time Brooks refused to enforce Price-Cornelison's permanent protective order. We undertake this inquiry "in light of the specific context of the case, not as a broad general proposition. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Cortez, 478 F.3d at 1114 (citations, quotations, alterations omitted).

Brooks refused to enforce Price-Cornelison's permanent protective order on November 3, 2003. It was much earlier, in 1988, that Watson clearly established that, "[a]lthough there is no general constitutional right to police protection, the state may not discriminate in providing such protection." 857 F.2d at 694; see also DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196, 197 n.3 (1989) (noting that, although "the Due Process Clauses generally confer no affirmative right to governmental aid," "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause"). Watson reached this conclusion

21

specifically in the context of addressing police protection afforded to domestic abuse victims.  See 857 F.2d at 694.  Watson, therefore, was sufficient to put Brooks on notice that providing Price-Cornelison less police protection than other domestic violence victims because she is a lesbian would deprive her of equal protection of the law, at least in the absence of an articulated rational governmental reason for such discrimination.

This is true even assuming that Brooks was acting according to a County policy of affording less police protection to lesbian victims of domestic violence, because Watson would have put Brooks on notice that applying such a policy could result in a constitutional violation.  See Lawrence v. Reed, 406 F.3d 1224, 1231-32 (10th Cir. 2005) (inquiring whether, "in spite of the existence of [County policy], a reasonable officer should have known that his conduct was unlawful"); see also Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003) (noting that, "[i]n considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question") (emphasis added).  See generally Watson, 857 F.2d at 697 (reversing decision granting plaintiffs summary judgment on their claims asserted against individual officers, in their individual capacity, for the district court to consider officers' qualified immunity defense, where this court held plaintiffs had presented sufficient evidence to survive summary judgment on plaintiffs' claims

22

alleging that the City had a policy that deprived them of equal protection). In any event, Brooks does not argue here that he is entitled to qualified immunity because he was following official policy, nor does he attempt to argue that there is a rational basis for such a policy; instead, he denies that there is such a policy.

### 3. Conclusion

For the foregoing reasons, we reverse the district court's decision denying Brooks qualified immunity on Price-Cornelison's equal protection claim, to the extent that claim is based upon Brooks' refusal, on October 16, 2003, to enforce Price-Cornelison's <u>emergency</u> protective order. But we affirm the district court's decision denying Brooks qualified immunity on Price-Cornelison's equal protection claim to the extent that it is based upon Brooks' refusal to enforce Price-Cornelison's <u>permanent</u> protective order on November 3, 2003.

### B. Price-Cornelison's Fourth Amendment claim

#### 1. Whether Price-Cornelison has sufficiently shown a Fourth Amendment violation.

Price-Cornelison alleges that Brooks' conduct on October 16, 2003—particularly his telling Price-Cornelison he would arrest her if she returned to her residence that day while Rogers was still there—enabled Rogers to unlawfully seize Price-Cornelison's property in violation of the Fourth Amendment.

> The Fourth Amendment, made applicable to the States by the Fourteenth, provides in pertinent part that the "right of the people to be

23

> secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."
>
> A "seizure" of property . . . occurs when there is some meaningful interference with an individual's possessory interests in that property.

Soldal v. Cook County, 506 U.S. 56, 61 (1992) (quotation, citation omitted).

Here, Price-Cornelison has sufficiently alleged a seizure of her property. That seizure, however, was conducted by Rogers, a private citizen. Only government action, and not the conduct of private parties, implicates the Fourth and Fourteenth Amendments: "[T]he Fourteenth Amendment establishes an essential dichotomy between governmental action, which is subject to scrutiny under the Fourteenth Amendment, and private conduct, which however discriminatory or wrongful, is not subject to the Fourteenth Amendment prohibitions." Marcus v. McCollum, 394 F.3d 813, 818 (10th Cir. 2004) (quotations omitted).

> Governmental defendants "normally can be held responsible for a private decision only when they have exercised coercive power or have provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."

Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982)) (alterations omitted). Here, however, Price-Cornelison has sufficiently alleged that Brooks aided Rogers' removal of the property from the farm to state a Fourth Amendment claim against Brooks.

24

This court most recently addressed a police officer's liability for a private party's seizure of property in <u>Marcus</u>. There, a private citizen, McCollum, was attempting to repossess a car from Marcus. <u>See id.</u> at 816. McCollum made an on-duty police officer, Wilson, who was parked across the street from the car to be repossessed, aware of what McCollum was going to do. <u>See id.</u> The officer remained across the street while McCollum, accompanied by a tow truck driver, attempted to repossess the car from Marcus' residential driveway. <u>Id.</u> Marcus and her minor son came out of their residence and heatedly protested the repossession, asserting McCollum was seizing the wrong car. <u>Id.</u> That turned out to be true. <u>Id.</u> Officer Wilson eventually called for "back-up" and then drove over and joined this discussion. <u>Id.</u> Three other officers soon arrived on the scene. <u>Id.</u> The residents explained to Officer Wilson that McCollum had no legal interest in the car he was trying to take. <u>Id.</u> The officers did not request any documentation from McCollum that would support his claim to the car. <u>Id.</u> At one point during this discussion, Officer Wilson poked the minor resident in the chest with sufficient force to move him backwards. <u>Id.</u> Although the officers told Marcus that "repossession was a civil matter in which the police could not be involved, they also told Mrs. Marcus and [her son] to stop their interference, advising 'let them do what they're going to do and take it up in small claims court.'" <u>Id.</u> Marcus reported that the officers told her and her son that "if the situation escalated, someone would be going to jail" and that Marcus and her son

25

"should keep our mouth[s] shut, go back in the house or we would indeed go to jail that day." Id. at 817 (quotation omitted). Yet under governing Oklahoma law, all a citizen would have had to do to thwart such a repossession was to protest in some minor way: "[t]he general rule is that a debtor's request for the financer to leave the car alone must be obeyed." Id. at 820 (quotation omitted). However, because Marcus and her son "took [the officer's] statements as threats directed toward them, they followed the officers' instructions and allowed the car to be towed away." Id. at 817 (quotation omitted).

Under those circumstances, this court held that Marcus had alleged and supported a Fourth Amendment violation sufficient to survive summary judgment. See id. at 821-23. In reaching this conclusion, this court noted that "officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor." Id. at 818; see also id. at 818-19.

> It stands to reason that police should not weigh in on the side of the repossessor and assist an illegal repossession. To diffuse a volatile situation while ensuring a lack of state action, officers could direct both parties to seek a judicial determination. A curbside courtroom, in which officers decide who was entitled to possession, is precisely the situation and deprivation of rights to be avoided.

Id. at 820 (quotations omitted).

Determining whether a police officer has actually aided a private party's seizure of property "is particularly fact-sensitive, so the circumstances must be

examined in their totality." Id. at 819. In Marcus, this court recognized that, in making this determination, other circuits have considered such facts as whether the officer accompanied the private party onto the scene, told the debtor that the seizure was legal, ordered the debtor to stop interfering or he would go to jail, intervened at more than one step in the repossession process, failed to depart before the repossession has been completed, stood in close proximity to the creditor, and unreasonably recognized the documentation of one party over the other to suggest the officer actually assisted in the seizure. Id. (discussing cases). "[T]he overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." Id. In Marcus, this court concluded Marcus' and her son's Fourth Amendment claim should survive summary judgment because

> under plaintiffs' version of the facts a jury could find that the officers did more than merely acquiesce or stand by in case of trouble. The controlling question to be resolved by a factfinder is whether the officers were simply keeping the peace, as they were entitled to do, or aiding Mr. McCollum, as they were not.

Id. at 822.

In the case currently before this court, Brooks told Price-Cornelison that, because the property was community property, Rogers was entitled to take

27

whatever property she wanted from the farm[10] and, more importantly, he affirmatively told Price-Cornelison that he would arrest her if she returned to her own home in an effort to stop Rogers from taking Price-Cornelison's property.[11] Drawing reasonable inferences from this evidence in Price-Cornelison's favor, Brooks' threat to arrest Price-Cornelison dissuaded her from returning home until Rogers had left the farm.[12] Cf. Pepper v. Village of Oak Park, 430 F.3d 805, 806, 811 (7th Cir. 2005) (42 U.S.C. § 1983 claim alleging a Fourth Amendment violation could not survive summary judgment where plaintiff failed to submit evidence suggesting that police officer's presence actually deterred neighbors from calling police to report estranged husband was removing property from

---

[10]Brooks denies saying this. But at this stage in the proceedings, we must view the evidence in the light most favorable to Price-Cornelison. See Kirkland, 464 F.3d at 1188.

[11]While the emergency protective order required Rogers to leave the residence she had shared with Price-Cornelison by October 17, that protective order did not expressly limit Price-Cornelison's right to be present in her own home.

[12]Brooks asserts that, by threatening to arrest Price-Cornelison, he was just trying to keep the peace. In Marcus, however, this court cited authority from other circuits indicating that an officer's conduct could "give the repossession a cachet of legality and have the effect of intimidating [the debtor] into not exercising his right to resist, thus facilitating the repossession," "[e]ven if unintended," and therefore would "constitute police intervention and aid sufficient to establish state action." 394 F.3d at 819 (quotations omitted; emphasis added). In light of that authority, the relevant question in this case is not what Brooks intended when he threatened to arrest Price-Cornelison, but the effect his threat would have on an objectively reasonable person in Price-Cornelison's position.

28

wife's residence).  Price-Cornelison has thus shown facts sufficiently similar to those in Marcus to state a Fourth Amendment violation.[13]

### 2.    Whether this Fourth Amendment right was clearly established.

Because Price-Cornelison has sufficiently shown a Fourth Amendment violation, the next step is to determine whether this

> constitutional right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation.  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.

Cortez, 478 F.3d at 1114 (citations, quotations omitted).  "Although [Price-Cornelison] does not need to find a case with an identical factual situation, [s]he still must show legal authority which makes it apparent that in the light of pre-existing law a reasonable officer, in [Brooks'] position," would have realized that his actions were unlawful.  Moore v. Guthrie, 438 F.3d 1036, 1042 (10th Cir. 2006) (quotation omitted).

---

[13]Brooks asserts that he cannot be liable because he himself did not physically seize Price-Cornelison's property.  But the relevant case law does not require that.  In Marcus, for example, it was the private creditor, accompanied by a private tow truck driver, who physically repossessed the car; the officers were merely present during the repossession.  394 F.3d at 816.  Likewise, in Soldal, it was the private landlord and his private employees who physically removed a tenant's trailer home from a mobile home park, while police officers just stood by.  506 U.S. at 57-59.

We conclude that this Fourth Amendment right was clearly established on October 16, 2003, when Brooks told Price-Cornelison that Rogers could remove whatever property she wanted from Price-Cornelison's farm and threatened to arrest Price-Cornelison if she returned to her home on that day. Although Marcus was not decided until after the events at issue in this case occurred, Marcus itself involved facts that happened before the incident at issue in this case occurred. And this court, in Marcus, held that the law was clearly established, as of the time that the events in that case occurred, that an officer's assistance in a private party's seizure of property implicates Fourth Amendment protections. See Marcus, 394 F.3d at 816, 823-24 (holding officers were not entitled to qualified immunity for assisting private party's repossession occurring in February 2002); see also Abbott v. Latshaw, 164 F.3d 141, 149 (3d Cir. 1998) (relying in 1998 on Fuentes v. Shevin, 407 U.S. 67 (1972), to hold that reasonable police officers should know from established precedent "that their role is not to be participants in property deprivations without notice and an opportunity to be heard"). Brooks was thus on notice on October 16, 2003, that he could be liable for assisting a private party's unlawful seizure of property at the time he threatened to arrest Price-Cornelison if she returned to her home to prevent Rogers from taking Price-Cornelison's property. See Moore, 438 F.3d at 1042.

### 3. Conclusion.

Price-Cornelison has sufficiently alleged that Brooks violated her Fourth

30

Amendment protection against unreasonable seizures of her property. Further, this law was clearly established at the time of Price-Cornelison's and Rogers' property dispute.

## V.    CONCLUSION

For these reasons, we REVERSE the district court's decision denying Brooks qualified immunity from Price-Cornelison's equal protection claim, to the extent that claim was based upon his refusal to enforce Price-Cornelison's emergency protective order on October 16, 2003. But we AFFIRM the district court's decision denying Brooks qualified immunity to the extent her equal protection claim was based upon Brooks' refusal to enforce Price-Cornelison's protective order November 3, 2003, and on her Fourth Amendment claim. We REMAND this case for further proceedings consistent with this opinion.

05-6140, *Price Cornelison v. Brooks*

**O'BRIEN** J., Dissenting in part, concurring in part, concurring with the result in part:

Faced with a qualified immunity defense, a plaintiff "must first establish that the defendant violated a constitutional right." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). Price-Cornelison has failed to show Brooks violated her right to equal protection with respect to her permanent protective order on November 3, 2003. Thus, he is entitled to qualified immunity on that claim and I dissent from the majority's contrary conclusion. I join the decision with respect to the emergency protective order, dated October 16, 2003. With respect to the seizure claim, I concur in the result.

### A. Equal Protection Claim

Price-Cornelison alleges Brooks deprived her of equal protection of the law on account of her status as a lesbian victim of domestic violence by refusing to enforce her emergency and permanent protective orders to the same extent he enforced protective orders obtained by heterosexual victims of domestic violence. The district court found Garvin County had an unwritten custom or policy of providing less protection to lesbian victims of domestic violence and, consistent with this policy, Brooks himself provided less protection to Price-Cornelison. The County has not appealed from the court's finding and Brooks himself does not challenge the finding so, improbable as it seems from this record, we must

presume the existence of an unwritten discriminatory policy for purposes of this appeal.[1]

In finding the County had an unwritten discriminatory policy, the district court relied upon incident reports involving Amanda Lou Chandler, Mary Pelfrey, Tera Lynn Wiggins, and Cindy Selman. The majority correctly disregards the Pelfrey, Wiggins and Selman reports in considering the viability of the equal protection claim against Brooks because he was not the officer in charge of those cases. That leaves Chandler as the only comparator. The majority hangs its hat – and Price-Cornelison's equal protection claim – entirely on the contrast between Brooks' treatment of Price-Cornelison and his treatment of Chandler. There are two problems with this. First, contrary to the majority's assertion, Brooks had no personal involvement with respect to the enforcement (or lack thereof) of Price-

---

[1] The majority cites *Cortez*, 478 F.3d at 1120 n.16, for the proposition that we lack jurisdiction to review a sufficiency of the evidence determination in the context of a defendant's appeal from the denial of summary judgment based on qualified immunity. This proposition, which stems from *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995), may be a dead letter in light of *Scott v. Harris*, 127 S. Ct. 1769 (2007). In *Scott*, an appeal from the denial of summary judgment based on qualified immunity, the Court held the court of appeals erred in crediting respondent's version of the events (which was credited by the district court) because it "is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 1776. Thus, it appears we would have jurisdiction to review a district court's conclusion that the evidence is sufficient to survive summary judgment in the qualified immunity context, *id.* at 1774-75, if the issue was properly raised.

2

Cornelison's permanent protective order on November 3.[2]  Second, Price-Cornelison and Chandler were not similarly situated and their cases are not comparable.

The majority says, "It appears that [Brooks] may . . . have spoken to Price-Cornelison [on November 3]."  (Majority Op. at 16-17.)  The record does not support this.  Price-Cornelison testified she called the sheriff's department on November 3 and spoke to "a lady."  (R. Vol. II at 349.)  She was asked: "Did you talk to anyone else at the sheriff's office?" and responded: "Just this lady.  I called a couple times . . . ."  (*Id.*)  A little while later, this exchange took place:

Q:     Did you talk to anybody else at the sheriff's office that night [November 3]?

A:     No.  I made several calls, and the lady told me they weren't sending nobody out, that they were busy.

Q:     So she's the only one you talked to at the sheriff's office?

A:     Yes.  I kept getting the same lady when I called.

(*Id.*)

---

[2]  As the majority notes, Brooks' refusal to enforce Price-Cornelison's emergency protective order on October 16, 2003, cannot be compared to his willingness to enforce Chandler's protective order because Price-Cornelison's emergency protective order was not enforceable on October 16.  Thus, we must look only to Brooks' actions on November 3, 2003, with respect to the permanent protective order.  Only acts or refusals to act on that date may be compared to his actions in the Chandler matter.

Consistent with Price-Cornelison's recollection, the records of the sheriff's office indicate Price-Cornelison spoke to Deputy Cricket Warren, a woman, not to Brooks. Warren's note of Price-Cornelison's 5:53 p.m. call, prepared contemporaneously, indicates Warren contacted "g4" who advised that if Price-Cornelison called back, Warren was to "tell her to contact g2 in the mourning [sic]." (R. Vol. I at 163.) Brooks testified (and no one disputes) that g4 refers to Chad Hillis and g2 refers to him. Thus, it was Hillis, not Brooks, who advised the dispatcher that if Price-Cornelison called again, she was to be told to contact Brooks the next day.

The only evidence that could even possibly suggest Brooks spoke with Price-Cornelison on November 3 is his testimony that he could not recall whether he spoke to Price-Cornelison on November 3.[3] Direct testimony (Price-Cornelison) as to a fact is not disputed simply because another witness (Brooks) fails to recall the event. The Supreme Court recently explained: "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 127 S. Ct. at 1776 (quoting Fed. R. Civ. P. 56(c)). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

---

[3] Notably, the reference to "Exhibit 6" in footnote 7 of the majority opinion is to the log of the 5:53 p.m. phone call between Price-Cornelison and Deputy Warren. Thus, Brook's testimony (that the exhibit is a record of the call Price-Cornelison may have made to him on November 3) is clearly incorrect.

4

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). In *Scott*, the Court rejected the plaintiff's version of the facts (which the district court had credited), explaining: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Price-Cornelison's version of the facts (as set forth in her appellate brief) is contradicted by her own testimony and the record as a whole. Brooks certainly had contact with Price-Cornelison prior to and after November 3, but the question here is whether Brooks' conduct (not some other officer's conduct) with Price-Cornelison (not one of her hired helpers) on November 3 (not some other date) is sufficient to support an equal protection claim. It is not.

Even if Brooks had been aware on November 3 of Price-Cornelison's complaints regarding her permanent protective order, nothing suggests he treated her differently than heterosexual victims of domestic violence. The only comparator is Chandler and the record contains little information about her case. According to the incident report, Chandler contacted the Garvin County Sheriff's Office on September 29, 2003, and advised dispatch her ex-husband was following her and trying to get her to pull over. She called back approximately

5

ten minutes later and spoke to Brooks. She informed Brooks she was still being followed by her ex-husband and was going to get off the highway. She also told Brooks she had a protective order against her ex-husband. She asked Brooks what she should do and he advised her to drive to the sheriff's office. Brooks did not send an officer to meet her; nor did he send an officer to her home. When she arrived at the sheriff's office, Brooks had her and the person with whom she had been traveling complete affidavits. Charges were filed against Chandler's ex-husband for violation of the protective order.

In *Jennings v. Stillwater*, a class-of-one equal protection case, we held the plaintiff "failed to make an adequate showing that similarly situated persons were treated differently." 383 F.3d 1199, 1213 (10th Cir. 2004).[4] While this is not a class-of-one case, *Jennings* is still instructive on the plaintiff's burden. We stated in *Jennings*: "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Id.* at 1214. "When multiple variables are in play . . . the difference in treatment can be the

---

[4] I recognize class-of-one equal protection claims are somewhat different from traditional equal protection claims. *See Jennings*, 383 F.3d at 1213 (discussing the difference between "[t]raditional equal protection law" and class-of-one equal protection law). But even in a traditional equal protection case, "plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998). In *Barney*, we held the female plaintiffs' equal protection claim failed because they could not "make the required threshold showing that they were treated differently from male inmates who were similarly situated . . . ." *Id.* at 1312-13.

6

product of a number of considerations, conscious or otherwise, many of them legitimate." *Id.* So it is here.

This case and Chandler's case stand in stark contrast – the differences involve the immediacy and object of the threat. In Chandler, the threat was to the victim's personal safety; here, the threat was only to property, as Price-Cornelison was not present at her house when Rogers entered onto her land. In Chandler, the threat was immediate; here, it was remote[5] as Rogers had already departed the property when Price-Cornelison contacted the sheriff's office on November 3. The district court erroneously treated unlike circumstances as comparable.[6] The majority does as well.

---

[5] With respect to enforcement of Price-Cornelison's emergency protective order on October 16, Brooks testified it was the difference in the immediacy of the threat that accounted for the differential treatment:

> If [Ms.] Cornelison is not in any danger, she is not anywhere near the house, I don't see a need that I would have to go out there to protect [Ms.] Cornelison. If she's in Munster, Texas, . . . there's enough space and time there that I wouldn't have to worry about her physical well-being and that's what the whole purpose of a victim's protective order is . . . .

(R. Vol. II at 366.) The same logic would apply to the November 3 incident had Brooks known about it. While the permanent protective order directed Rogers to remain away from Price-Cornelison and her residence, there is surely a qualitative difference between a threat to a domestic violence victim (as in Chandler) and a threat to a victim's residence (as here).

[6] Another variable impacting human interaction is tact. Although not determinative, the conduct of Price-Cornelison's counsel quite possibly fouled the air. According to Brooks, on October 16, Price-Cornelison's counsel spoke to

(continued...)

And that still leaves the problem of discriminatory intent – a problem not adequately addressed by the majority. In *Watson v. Kansas City*, we held:

> [T]o survive summary judgment, the plaintiff must go beyond her pleadings and show that she has evidence of specific facts that demonstrate that it is the policy or custom of the defendants to provide less police protection to victims of domestic assault than to other assault victims. *She must also provide evidence that discrimination was a motivating factor for the defendants* and that she was injured by operation of the policy or custom.

857 F.2d 690, 694 (10th Cir. 1998) (emphasis added). There are two defendants in this case – Garvin County and Brooks. To survive summary judgment, Price-Cornelison had to present some evidence that Brooks himself was motivated by a discriminatory purpose. *See id.* She failed to make that showing.

The majority imputes discriminatory intent to Brooks based on the presumed County policy and Brooks' knowledge that Price-Cornelison was a lesbian, but it cites no case law suggesting these factors are sufficient.[7] While Brooks was certainly aware Price-Cornelison was a lesbian, no evidence suggests he possessed any animus towards her in particular or lesbian domestic abuse

[6](...continued)
him regarding enforcement of the emergency protective order. She told him to get off his "donut eating ass" and do something. (R. Vol. I at 29.) Price-Cornelison's counsel spoke to a different deputy on November 3, and complained the sheriff's office "won't do shit." (*Id.* at 162.) Brooks later told Price-Cornelison her counsel had upset his deputies and advised her she needed to get a different attorney.

[7] The majority's only citation is to a law review article from 1991. The article is not persausive.

8

victims in general. The evidence in the record actually suggests otherwise. Mary Sanchez, one of Price-Cornelison's friends, reported: "Mr. Brooks informed me that 'Ms Rogers and Ms Cornelison had been in one of those "lesbian relationship" [sic] for 7 years and that Oklahoma was a community property state.' He informed me it was not any different tha[n] a male and female married relationship." (R. Vol. II at 407.) This quotation does not reflect animosity towards homosexuals – on the contrary, it reflects Brooks' willingness to consider cohabiting homosexuals as akin to married heterosexuals.

Sanchez also stated: "I asked [Brooks] if we ([Price-Cornelison] and I) could go to the house. He said [Price-Cornelison] was not allowed to [go] there as long as [Rogers] was there and she had until 12 midnight the 17th to be there." (*Id.*) Brooks was clearly mistaken, but that does not suggest discriminatory intent. In fact, there is no evidence Brooks had a double standard. Self-serving (but unrefuted) is Brooks' statement: "During my employment with the Sheriff's Office, I have never discriminated against women, including the Plaintiff Dana Price-Cornelison, with regard to the service and execution of protective orders, or disputes over property."[8] (R. Vol. I at 58.)

---

[8] Similarly, sergeant and deputy sheriff Chad Hillis and reserve deputy Mike Henderson each testified: "No one ever associated with the Sheriff's Office ever made any statements to me that was negative towards . . . Ms. Cornelison as to her sexual orientation, or as to her status as a woman." (R. Vol. I at 140, 155-56.) Front office deputy Hellen Cavnar testified: "I never observed any
(continued...)

Without the majority's tenuous inference that Brooks knew of and followed the County's unwritten discriminatory policy, Price-Cornelison has no case. In *Watson*, we noted: "[T]here is no inherent inconsistency in allowing a suit alleging an unconstitutional policy or custom to proceed against the city when the individuals charged with executing the challenged policy to injure the plaintiff have been relieved of individual liability." *Id*. at 697. That is the result I would reach here – Price-Cornelison can pursue her equal protection claim against the County, but not against Brooks. In fact, her claim against the County continues as the County did not appeal from the denial of its motion for summary judgment.

## B.    Seizure Claim

"A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *Winters v. Bd. of County Comm'rs*, 4 F.3d 848, 853 (10th Cir. 1993) (citation and quotations omitted). Here, it was Rogers, not Brooks, who interfered with Price-Cornelison's possessory interest in her property. In extending the rule the

---

[8](...continued)
discrimination toward women with regard to the way that complaints by women were handled by the Garvin County Sheriff's Office." (*Id.* at 159.) Secretary-bailiff Camille Frizell testified: "[I]n my opinion, there is no discrimination against women by the Garvin County Sheriff's Office with regard to the service or enforcement of protective orders. I also saw no discrimination against Dana Price-Cornelison by any member of the Sheriff's Office on the basis of her sexual orientation." (*Id.* at 160.)

10

majority looks to *Marcus v. McCollum*, 394 F.3d 813 (10th Cir. 2004). In

*Marcus*, we cited *Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999), for the

proposition: "[W]hen an officer begins to take a more active hand in the

repossession . . . a point may be reached at which *police assistance at the scene*

of a private repossession may cause the repossession to take on the character of

state action." *Marcus*, 394 F.3d at 818 (emphasis added). Central to our decision

was this observation:

> As is typical of these cases, a self-help repossessor in Oklahoma may
> take possession of property without judicial process only if he or she
> has a security interest in the targeted property and no breach of the
> peace takes place. *See* OKLA. STAT. tit. 12A, § 1-9-609. This rule
> derives from the Uniform Commercial Code, which states "after
> default, a secured party . . . may take possession of the collateral . . .
> (1) pursuant to judicial process; or (2) without judicial process, *if it
> proceeds without breach of the peace*." U.C.C. § 9-609 (formerly
> U.C.C. § 9-503) (emphasis added); *see also Helfinstine v. Martin*,
> 561 P.2d 951, 954 (Okla. 1977) (recognizing the current statutory
> "right to peaceful self-help repossession of property . . . has roots
> deep in the common law").

*Id.* at 819-20.

At least two factors distinguish this case from *Marcus*. First, this was not a

repossession therefore the restriction on self-help repossession contained in the

Uniform Commercial Code (U.C.C.) (cannot disturb the peace) does not apply.

Second, Brooks was on the phone, not at the scene. Since Rogers was not privy

to the conversation between Brooks and Price-Cornelison, she could not have

taken anything Brooks said or did as tacit approval of her act of retrieving

11

property from the common dwelling.

In *Marcus*, there were four police officers present at the time the plaintiff's car was repossessed — the plaintiff testified there was a "circle of officers standing in her front yard." *Id.* at 822 n.11 (quotations omitted). One of the officers "remained at the plaintiffs' residence until the towing was completed, and he may also have forcibly poked [the minor plaintiff]." *Id.* at 821. Here, by contrast, Brooks was not present when Rogers took Price-Cornelison's property. Obviously he had no physical contact with Price-Cornelison or any of her associates.

I have not discovered a single case where an officer's long-distance, telephonic assistance in a private repossession was held to satisfy the state action requirement. The cases we relied upon in *Marcus* all involved officers being physically present. *See, e.g.*, *Barrett*, 189 F.3d at 302 (noting "no bright line has been drawn delineating the exact point at which an officer's presence and activities at the scene of a repossession become state action" but "[w]hen an officer begins to take a more active hand in the repossession, . . . a point may be reached at which police assistance . . . may cause the repossession to take on the character of state action"); *Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985) (concluding summary judgment was improper because a jury "could find that [the officer's] arrival with the repossessor gave the repossession a cachet of legality and had the effect of intimidating [the plaintiff] into not exercising his

12

right to resist").

Extending the majority's analogy, a police officer assigned to "civil standby"[9] in a domestic situation, like one called to a repossession, is expected to keep the peace, but not take sides. *Marcus*, 394 F.3d at 819-20. To do so in an emotionally charged environment where one party is required to take his (or her) property and move out of the home might require Solomonic power. Not surprisingly, property ownership is often at issue and the Marquis of Queensberry rules are not universally respected. Consider this: one party removes an expensive oil painting from the wall, claiming ownership. The other, also claiming ownership, grabs it and a physical scuffle ensues. The officer steps in to quell the disturbance but it is obvious, because the parties are intractable and determined, that the physical altercation will resume unless the officer somehow assigns temporary possession to one of the parties. How is that done without "taking sides"?

In *Marcus* we said:

This area of the law is particularly fact-sensitive, so the circumstances must be 'examined in their totality.' If the evidence showed, for example, that an "officer came on the scene at the request of the repossessor and said to the debtor, 'don't interfere with this repossession,' or 'you know you're not the rightful owner of [the property],'" an officer might be liable.
. . .

---

[9] Surely a prized assignment.

13

> Other factors courts take into consideration include intervening at more than one step; failing to depart before completion of the repossession; standing in close proximity to the creditor; and unreasonably recognizing the documentation of one party over another. To repeat, the overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance.

*Id.* at 819 (citations omitted). Certainly the caution about fact sensitivity and the need for a global approach are well taken. But repossession cases are aided by the U.C.C.'s protection of the status quo, which is not replicated in domestic cases. That makes the calculus even more difficult. For those reasons I would normally be loath to extend the *Marcus* holding to a domestic case. But on these peculiar facts, I see no alternative.

I agree with the majority that Brooks crossed the line on October 16 **if** he threatened to arrest Price-Cornelison if she returned to her house to prevent Rogers from taking her property.[10] By this threat (if made), Brooks, like the officers in *Marcus*, arguably aided Rogers' seizure by precluding Price-Cornelison from exercising self-help to prevent Rogers from either removing the property or by observing and documenting the property removed. However, I cannot reconcile myself to another of the majority's observations.

---

[10] Price-Cornelison claims Brooks told her he would arrest her if she went to her property while Rogers was there. Brooks says he told her she could be arrested if she went to the property and interfered with Rogers' right to remove her (Rogers') property. In this appeal we must accept Price-Cornelison's version of events.

14

Had Brooks simply refused or failed to respond to Price-Cornelison's request for assistance in restraining Rogers' activities, this seizure claim would not lie.[11] With that in mind, I disagree with the majority's suggestion that Brooks' ill-considered advice (informing Price-Cornelison the property was community property and Rogers was entitled to take what she wanted until the emergency protective order went into effect) might be an actionable element of a seizure claim. His statements, whether or not correct, do not constitute the type of affirmative state action that can support a § 1983 seizure claim. It is not coercive – Price-Cornelison could and should have rejected it as unsolicited and unprofessional legal advice. Moreover, she had her own actively involved attorney to turn to for such advice. And Rogers could not have taken encouragement from the statements since she was not privy to the conversation.

In summary, I join the majority opinion with respect to the emergency protective order (reversing the district court's denial of qualified immunity), I dissent from that part of the decision with respect to the permanent protective order (affirming the district court's denial of qualified immunity) and I concur in the result with respect to the seizure claim.

---

[11] Nor would a § 1983 complaint based upon procedural or substantive due process. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 768 (2005) (procedural); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195, 202 (1989) (substantive).